In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00029-CR
______________________________


RANDALL LYNN MAYNARD, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 18395


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter


O P I N I O N

            On October 11, 2002, a Lamar County jury convicted Randall Lynn Maynard of intoxication
manslaughter


 and assessed his punishment at forty-five years in the Texas Department of
Corrections–Institutional Division. The trial court denied Maynard's motion for new trial, after
which he timely perfected his appeal to this Court, bringing forth two points of error. Maynard
complains that the evidence was insufficient to sustain his conviction for intoxication manslaughter
and jury misconduct prevented him from receiving a fair trial. He contends the trial court abused
its discretion by overruling his motion for new trial on these grounds.
Standards of Review
            Analysis of the factual sufficiency of the evidence is not required if the issue is not
specifically raised. See Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). Since it is
unclear as to whether Maynard refers to legal or factual sufficiency, we are authorized to limit our
analysis to legal sufficiency of the evidence. See Dorsey v. State, 940 S.W.2d 169, 173 (Tex.
App.—Dallas 1996, pet. ref'd). In the interest of fairness, however, we will address and employ the
standards for reviewing both legal and factual sufficiency. 
            The standard of review for assessing the legal sufficiency of the evidence is whether, after
viewing the evidence in a light most favorable to the verdict, any rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307 (1979). When reviewing the factual sufficiency of the evidence to support a conviction, we must
view the evidence in a neutral light and set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. Johnson v. State,
23 S.W.3d 1, 6–7 (Tex. Crim. App. 2000). We determine whether a neutral review of all the
evidence, both for and against the verdict, demonstrates that either the proof of guilt is so obviously
weak as to undermine confidence in the jury's determination or that the proof of guilt, although
adequate if standing alone, is greatly outweighed by contrary proof. King v. State, 29 S.W.3d 556,
563 (Tex. Crim. App. 2000); Johnson, 23 S.W.3d at 11.
            We review a trial court's denial of a motion for mistrial based on juror misconduct for an
abuse of discretion. Lewis v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). The reviewing court
does not substitute its judgment for that of the trial court, but rather decides whether the trial court's
decision was arbitrary or unreasonable. Id. The trial court is the sole judge of the credibility of the
testifying jurors. Thomas v. State, 699 S.W.2d 845, 854 (Tex. Crim. App. 1985). Where there is
conflicting evidence on an issue of fact as to jury misconduct, the trial court determines the issue,
and it is not an abuse of discretion to overrule the motion for new trial. Id.
Factual History
            Viewed in a light most favorable to the verdict, the facts of this case depict the following
sequence of events: On May 12, 2000, at approximately 8:00 p.m., Maynard went to
Jimmy Marion's house in Paris, Texas. Marion was married to Maynard's cousin, Shawna Marion. 
Maynard and Marion visited and drank beer for approximately one and one-half hours. The two men
left the residence at approximately 9:30 p.m. to use the telephone down the street. Ten minutes later,
they returned to Marion's house, where they continued to drink beer until approximately 10:30 p.m. 
They then went to shoot pool and have a drink at the bowling alley, where they stayed for
approximately thirty minutes. 
            From the bowling alley, Maynard and Marion went to Baby Dolls, a strip club at the outskirts
of Paris. Marion's sister-in-law, Selina Noel, saw the two men at the club and testified that, while
at the strip club, Maynard was behaving obnoxiously–cursing and being loud. This conduct was
reported to a bouncer at the club, who asked Maynard to leave. Outside the club, Maynard became
aggressive and combative toward the bouncer. Marion, on the other hand, acted in a calm manner
and wanted to leave without further incident. Marion helped the bouncer get Maynard into the
passenger's side of the vehicle. At approximately 11:30 or 11:40 p.m., Marion drove the truck away
from the club. According to the bouncer, however, the vehicle stopped at the end of the club's
parking lot. The two men exited the vehicle, switched positions, and then continued driving away,
now with Maynard at the wheel. 
            No one knew the whereabouts of the two men after they left the club until approximately
12:23 a.m., when two men, Phillip Strickland and Chad Bramblett, came upon a one-car accident
on FM 196 approximately two miles south of FM 195. According to Strickland and Bramblett, both
Maynard and Marion were located outside the vehicle, lying on the road. One man was near the
vehicle on the passenger's side, and the other a short distance from the vehicle toward the middle of
the road. Neither man appeared conscious. The car caught fire very soon after the two men arrived
at the accident scene. The two men pulled the man near the passenger's side of the vehicle away
from his location near the burning car. According to Bramblett, it was obvious the man near the car
was already deceased. Strickland woke the other man. Danya Heise, another passerby whom
Strickland and Bramblett flagged down, instructed Maynard not to move and told him she was going
to call the police. To this, Maynard protested calling the police, got up from the road, and wandered
into the nearby wooded area. 
            Volunteer firefighters arrived shortly thereafter, followed by Trooper James Kain of the
Texas Department of Public Safety (DPS) at 12:30 a.m. Paramedics arrived at 12:38 a.m. and
confirmed that one occupant of the vehicle was deceased. Kain identified the deceased man as
Jimmy Marion through an identification card on his person, and he and Captain L. D. Ruthart of the
Lamar County Sheriff's Office then began a search for the other occupant. Ten minutes later, Ruthart
found the other occupant, identified as Maynard, lying in a ditch beside the road 228 feet from the
accident scene. Paramedics immobilized Maynard, placed him in an ambulance, and, at Kain's
request, drew blood from Maynard before transporting him to the hospital. 
            Maynard was treated for minor injuries at the hospital. Blood samples taken at the hospital
revealed that Maynard had a .16 blood alcohol content. Kain arrived at the hospital an hour or two
later. He asked Maynard where Marion was in the car, and Maynard responded Marion was a
passenger.


 Maynard also told Kain he had pulled Marion out of the car. Results of the DPS tests
performed on the blood taken at the accident scene yielded a blood alcohol content of .17. 
            As part of the investigation of the accident, several photographs were taken of the scene,
depicting the damage to the vehicle, the position of Marion's body in relation to the car, and the
marks indicating the nature of the impact. Later, by examining the accident scene, Kain and
Lieutenant Bob Hundley of the Paris Police Department also gathered measurements to create a
computer-generated diagram representing the trajectory and points of impact associated with the
accident. 
Sufficiency of the Evidence
            One commits intoxication manslaughter if he or she operates a motor vehicle in a public
place while he or she was intoxicated and that, by reason of that intoxication, caused the death of
another by accident or mistake. Tex. Pen. Code Ann. § 49.08 (Vernon 2003). Maynard challenges
the proof pertaining to only one of these elements, contending the State failed to present evidence
that proves beyond a reasonable doubt he was operating the vehicle at the time of the accident.
            Maynard relies primarily on two cases to support his contention the evidence is insufficient
to establish he was the driver at the time of the accident. First, Maynard points to Young v. State,
544 S.W.2d 421 (Tex. Crim. App. 1976). In Young, police arrested the driver of a car with two
passengers and, at the driver's request, left the keys with Young. Id. at 422. Approximately one hour
later, the officers were called to the scene of a two-car accident involving this same car. Id. The car
had flipped over, but both occupants survived. Id. A witness who from his home saw the accident
occur testified that he went to the overturned car and saw that Young was toward the front and the
other occupant was toward the back. Id. With no other evidence Young was driving the vehicle at
the time of the accident, the Texas Court of Criminal Appeals reversed his conviction for murder
without malice.


 Id. at 424.
            Maynard also relies heavily on Coleman v. State, 704 S.W.2d 511 (Tex. App.—Houston [1st
Dist.] 1986, pet. ref'd), in which the court reversed a driving while intoxicated conviction based on
insufficient evidence to establish that the appellant was driving the vehicle involved in a two-car
accident. In response to an officer's questions at the accident scene, Coleman stated he had been
driving. Id. at 511. Coleman also told another officer he had "run into" the vehicle in front of him. 
Id. Aside from these extrajudicial confessions, there was no evidence presented that Coleman was
the driver of the vehicle at the time of the accident. Id. As a result, the court reversed his conviction. 
Id. at 512.
Legal Sufficiency
            Marion's widow, Shawna, testified that Marion rarely drove and that he did not have a
driver's license. Maynard had been driving the vehicle involved in the accident earlier in the day. 
The bouncer at the club where the two men were last seen testified that, while Marion first drove the
car from the club, the two men exited the vehicle, crossed behind the car to switch positions, and
Maynard drove off the club parking lot. 
            Testimony of Strickland and Bramblett, the two men who first arrived at the accident scene,
that Marion's body was positioned near the passenger's side of the car supports the conclusion that
Maynard was driving the vehicle at the time of the accident. Marion's position is confirmed by the
fact that his blood was pooled near the passenger's side door. Maynard's flight from the accident
scene on hearing that witnesses were going to summon the police and his subsequent reluctance to
talk to the police indicate he was driving the vehicle and feared what might happen as a result of his
involvement. 
            The investigation of the accident revealed that the vehicle left the road at a forty-five-degree
angle and collided with trees alongside the road. The initial impact occurred at the front of the car
on the passenger's side. The momentum of the car caused it to spin into a second impact at the
passenger's side of the car. The third and final impact along the tree line occurred at the rear of the
car and sent it another thirty-two feet back toward the road, leaving the car in the position in which
it was found partially on the road. The points of impact are consistent with substantial damage to
the passenger's side of the vehicle as reflected in the photographs taken of the accident scene. It
stands to reason that a person located in the passenger's seat of the vehicle could sustain far more
substantial injuries than a person located elsewhere in the car.


 Maynard was treated for minor
injuries from the accident; Marion suffered "major" skull fractures caused by blunt force trauma. 
Indeed, this conclusion was confirmed by the conversation at the hospital in which Maynard told
Kain that Marion was a passenger in the car. 
            Additionally, Shawna managed to place a call to the jail and spoke with Maynard later on the
day of the accident. Shawna testified Maynard told her something popped up in the road and he
swerved. When asked by counsel to clarify to whom "he" referred to in the original conversation,
Shawna made clear that Maynard told her it was Maynard who swerved. In the letter to his cousin
Shawna, Marion's widow, Maynard apologizes "that this happened" and that he asks himself every
night "why him" and "not me." Although not conclusive, a rational trier of fact could conclude that
such statements tend to show he feels guilt associated with his role in the accident. 
            These facts distinguish Maynard's case from both Young and Coleman. Again, the court in
Young employed the now defunct outstanding reasonable hypothesis analysis to arrive at the
conclusion the evidence was insufficient. Young, 544 S.W.2d at 423. Second, according to the
witnesses' accounts, the positions of the occupants of the vehicle after the accident are less certain
in Young as they are on these facts. See id. at 422. While Young is similar in that there was a time
period in which there is no direct testimony as to who was driving, Young lacks any evidence as to
the nature of the injuries, any admission as to being the driver, and any testimony from the other
occupant. Coleman, too, is easily distinguished. It is marked by an absence of any evidence that
Coleman was the driver other than his statements at the scene of the accident. Here, the record
contains a great deal more evidence that Maynard was the driver.
            The case before the Court is most analogous to Redmond v. State, 30 S.W.3d 692 (Tex.
App.—Beaumont 2000, pet. ref'd). Redmond was convicted of intoxication manslaughter after her
truck, occupied by herself and two others, collided with another vehicle. Id. at 695. As she was
leaving the scene in an ambulance, she stated to a DPS trooper, "I was going down the road." Id. 
The trooper then asked her to confirm she was the driver, and she nodded in the affirmative. Id. 
Maynard made similar confessions to Trooper Kain and also to Marion's widow. Another of the
occupants of Redmond's truck testified she was the driver. Id. Additionally, Redmond sustained
injuries one would expect from being a driver of a vehicle in a collision of that nature. Id. at 695–96. 
Here, the converse is true. Maynard suffered virtually no injuries, while Marion sustained the
massive head injuries consistent with being in the passenger's position when the vehicle hit the trees.
            One of the occupants of Redmond's truck testified Redmond was the driver. Id. at 695. Here,
however, the Court does not have the benefit of an occupant's testimony as to who was driving. 
Instead, the Court is limited to testimony of the bouncer as to who was driving approximately forty-five minutes before the accident, coupled with the physical evidence at the scene that supports the
bouncer's testimony, and Maynard's own admissions. Viewing the evidence in a light most favorable
to the jury's verdict of guilty, we conclude the evidence is sufficient to enable a rational jury to
conclude Maynard was driving the vehicle at the time of the accident and overrule Maynard's
contention to the contrary.
Factual Sufficiency
            Maynard contends the bouncer's testimony that he saw Maynard and Marion switch positions
at the edge of the club's parking lot is undermined by the photographs taken at the Baby Dolls'
premises. Maynard maintains the bouncer could not have seen such a switch from such a distance
and at such a vantage point. However, as the State points out, the record does not clearly indicate
the bouncer's exact location when he saw the men exit the vehicle. Therefore, the photographs do
little to undermine the bouncer's testimony. Additionally, the jury was well within its authority in
resolving any conflict raised by the photographs and the testimony.
            Maynard also makes much of the fact that photographs taken at the accident scene show that
the passenger's side door is open and the driver's side door is closed. He argues he opened the
passenger's side door and pulled Marion from his position in the driver's seat through the passenger
area and out the passenger door. However, the State counters with the explanation, supported by
Maynard's testimony at the hospital and other evidence, that he opened the passenger's side door
when he pulled Marion from the passenger's seat.
            A neutral review of the evidence does not convince us that the proof of guilt is so weak as
to undermine our confidence in the jury's determination. Additionally, the evidence that would tend
to show that Maynard was not the driver does not greatly outweigh the testimony, physical evidence,
and Maynard's own admissions that tend to prove he was the driver of the vehicle at the time of the
accident. We overrule Maynard's point of error challenging the factual sufficiency of the evidence. 
Juror Misconduct
            Maynard also contends he was denied a trial by an impartial jury since one of the jurors had
a conversation with his mother related to the case. Therefore, he argues, the trial court abused its
discretion when it overruled his motion for new trial based on juror misconduct.
            Conversations about the pending case between jurors and other persons are prohibited except
in the presence of or with the permission of the court. Tex. Code Crim. Proc. Ann. art. 36.22
(Vernon 1981). A violation of this rule gives rise to a rebuttable presumption of harm and requires
the granting of a new trial absent sufficient rebuttal. McMahon v. State, 582 S.W.2d 786, 793 (Tex.
Crim. App. 1978) (en banc); Williams v. State, 463 S.W.2d 436, 440 (Tex. Crim. App. 1971).
            Maynard complains of an alleged conversation between juror Ricky Golden and Golden's
mother regarding the moral impact associated with strip clubs like Baby Dolls. The juror's mother
testified that she and her son had a conversation over dinner and that she made known her opinion
that clubs like Baby Dolls corrupt young people. The juror, on the other hand, denies that the
conversation took place and that he upheld his oath as a juror not to talk about the case. 
            Before we can assess the sufficiency of the State's rebuttal, we must first determine whether
a violation of Article 36.02 occurred. As stated, the trial court is the sole judge of the credibility of
the testifying jurors. Thomas, 699 S.W.2d at 854. When the trial court has before it conflicting
evidence on a fact issue as to juror misconduct, the trial court determines the fact issue and does not
abuse its discretion by overruling the motion for new trial. Id.
            Here, there was conflicting testimony heard on whether the conversation took place as
alleged. Golden testified that his mother was in the courtroom the whole time and that the two never
had a conversation about the case because, "I was sworn in not to tell." While his mother testified
that she and her son did talk about Baby Dolls, the trial court, not the appellate court, judges the
credibility of the witnesses. It was within the trial court's sound discretion to determine that no
prohibited conversation occurred. See Bratcher v. State, 771 S.W.2d 175, 190 (Tex. App.—San
Antonio 1989, no pet.). Therefore, there is no need for us to address the sufficiency of the State's
rebuttal of the harm presumed on a violation of Article 36.02. The trial court did not abuse its
discretion in overruling Maynard's motion for new trial.
Conclusion
            Since we find evidence in the record to be legally and factually sufficient to establish that
Maynard was operating the vehicle at the time of the accident, we overrule Maynard's first point of
error. We also overrule Maynard's contention that the trial court abused its discretion when it
overruled his motion for new trial. When the trial court is confronted with conflicting evidence
concerning alleged juror misconduct, resolution of the conflict is within the trial court's sound
discretion. 
            Accordingly, we affirm the judgment.



                                                                        Jack Carter
                                                                        Justice

Date Submitted:          December 4, 2003
Date Decided:             December 17, 2003

Do Not Publish